FILED
CLERK, U.S. DISTRICT COURT

10/19/2023

CENTRAL DISTRICT OF CALIFORNIA
BY:          TRB          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASE LEE COLLINS,<br><br>                                    Petitioner,<br><br>                    v.<br><br>WILLIAM SULLIVAN,<br><br>                                    Respondent. | Case No. 2:19-CV-10807-FMO (LAL)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

        This Report and Recommendation is submitted to the Honorable Fernando M. Olguin, United States District Judge, under the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

**I.**

**PROCEEDINGS**

        On December 22, 2019, Chase Lee Collins ("Petitioner") filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  On April 9, 2021, Respondent filed an Answer.  On May 20, 2021, Petitioner filed a Traverse.

        On September 29, 2022, this Court issued a Report and Recommendation recommending that the Petition be dismissed as procedurally barred based in part on: (1) a prior magistrate judge's finding that Petitioner had not exhausted his federal claims on direct review, and (2) the

1  California Supreme Court's subsequent denial of Petitioner's exhaustion petition on state

2  procedural grounds.  On November 18, 2022, Petitioner filed objections to the Report and

3  Recommendation.  On February 3, 2023, Judge Olguin sustained Petitioner's objections and

4  referred the matter back to the undersigned magistrate judge to consider the merits of Petitioner's

5  claims.  Judge Olguin found that Petitioner fairly presented his federal claims to the California

6  Supreme Court on direct review to exhaust his claims for purposes of federal habeas review.[1]

7  Thus, this matter is ready for decision on the merits.

8                                             **II.**

9                          **RELEVANT PROCEDURAL HISTORY**

10         On January 29, 2016, after a joint trial with codefendant Robert Zygo ("Zygo"), a Los

11  Angeles County Superior Court jury convicted both Petitioner and Zygo of one count of second

12  degree robbery[2] and one count of assault by means likely to produce great bodily injury.[3]

13  (Volume 2 Clerk's Transcript ("CT") at 223, 226-29, 232.)  The jury found true the allegation

14  that Zygo had personally used a rock in committing the robbery, but found "not true" the

15  allegations that Zygo and Petitioner had used a firearm in committing the robbery.  (2 CT at 223,

16  229.)  The jury found Petitioner and Zygo not guilty of assault with a deadly weapon.  (2 CT at

17  224, 230.)  In a bifurcated proceeding, Petitioner admitted he had suffered two prior strike

18  convictions.  (2 CT at 289.)  On April 8, 2016, the trial court sentenced Petitioner to a state

19  prison term of 35 years to life.  (2 CT at 307-09, 312.)

20         Petitioner appealed his convictions to the California Court of Appeal.  (Lodgments 7-9.)

21  On December 11, 2017, the California Court of Appeal affirmed the judgment in a reasoned

22  decision.  (Lodgment 1.)  On December 29, 2017, the California Court of Appeal denied

23  Petitioner's motion for rehearing.  (CM/ECF Dkt. No. 21-1, Exh. D.)

24         Petitioner filed a petition for review in the California Supreme Court which, as Judge

25  Olguin found (CM/ECF Docket No. 42 at 4), exhausted claims similar to those raised herein.

26  _____

27  [1] See CM/ECF Dkt. No. 42 at 3-4 (discussing Guillory v. Allen, 38 F.4th 849 (9th Cir. 2022)).

   [2] Cal. Penal Code § 212.5(c).

28  [3] Cal. Penal Code § 245(a)(4).

1  (Lodgment 2.)  On February 28, 2018, the California Supreme Court denied review without

2  comment.  (Lodgment 3.)

3      Petitioner filed a petition for writ of certiorari in the United States Supreme Court.

4  (Lodgments 4, 10.)  On January 7, 2019, the Supreme Court denied the petition.  (Petition, Appx.

5  D.)

6                                     **III.**

7              **SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

8      Because Petitioner challenges the sufficiency of the evidence to support his robbery

9  conviction, this Court has independently reviewed the state court record.  Based on this review,

10  this Court adopts the factual discussion of the California Court of Appeal's opinion in this case

11  as a fair and accurate summary of the evidence presented at trial:[4]

12          1.  *The Assault and Robbery*

13              a.  *Ricard's testimony*

14      According to [Lionel] Ricard's version of events, Ricard and Jesse

15  Holcombe went together to a neighborhood bar located in a shopping center in

16  Lancaster on the night of July 18, 2015.  Inside the bar Ricard saw [Petitioner]

17  and Zygo, two men with whom he had been friends when he lived in Lancaster.

18  Ricard, [Petitioner] and Zygo agreed to go outside to smoke marijuana.  Ricard

19  told Holcombe about the plan, and Holcombe said he would meet Ricard outside.

20      Ricard, [Petitioner] and Zygo left the bar and walked across the parking

21  lot to the darkened corner of an adjoining building.  Ricard leaned against a metal

22  railing and rolled a marijuana cigarette.  When he had finished, [Petitioner] told

23  him, "You're gonna pay for what you did to SDV Kid."  "SDV" was an acronym

24  for "Small Dick Virgins," a social group involved in extreme sports and partying

25

26  _____
[4] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . ." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. §

27  2254(e)(1)).  Thus, Ninth Circuit cases have presumed correct the factual summary set forth in an opinion of the state appellate court under 28 U.S.C. §2254(e)(1).  See, e.g., Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009)

28  (citations omitted).

3

to which [Petitioner] and Zygo had belonged.  "SDV Kid" apparently was the moniker of someone in the group, but Ricard claimed he did not understand what [Petitioner] meant.

[Petitioner] punched Ricard in the face, knocking his glasses off.  Zygo placed Ricard in a chokehold from behind.  Both [Petitioner] and Zygo punched and kicked Ricard.  At some point Ricard fell to the ground.  Zygo picked up a rock and used it to hit Ricard in the head multiple times.  Ricard described the rock as a "nice size boulder," "borderline the size of a kids' small basketball." While Zygo hit Ricard with the rock, [Petitioner] continued to kick him.

At this point Zygo pulled a semiautomatic handgun from his waistband, chambered a bullet and handed the gun to [Petitioner].  [Petitioner] held the gun, pointed down, while Zygo searched Ricard.  Ricard had $1,200 to $1,300 in cash, a wallet, cell phone and keys in his pockets.  Zygo took these items from Ricard, and he and [Petitioner] ran back in the direction of the bar.

Holcombe arrived and helped Ricard up.  Ricard found his wallet, cell phone and keys on the ground.  Ricard's head and face were bleeding; one tooth was loose; his shoulder and back were bruised; and he was dizzy.  Ricard walked back to the bar and cleaned up in the restroom.  He did not contact the police or ask that they be called; he intended to just "let it go."

When Ricard's mother saw his injuries the following morning, she insisted he call the police.  Ricard falsely told the emergency operator he had not called earlier because his phone was stolen.  He did not say anything about a gun or being punched in the face.  Ricard then went to the emergency room.  While he was being treated, a sheriff's deputy photographed his injuries.

b. *Holcombe's testimony*

Holcombe's description of the evening's events differed somewhat from Ricard's.  Ricard told him he was going outside to smoke marijuana but did not

1    indicate where he was going to be.  Holcombe went to his car, believing Ricard

2    was going to join him there.  While waiting, Holcombe smoked some marijuana.

3         As Holcombe was returning to the bar, he saw Ricard, who was

4    "rambling" and "seemed a little out of it."  Holcombe did not notice any injuries

5    to Ricard's face.  Holcombe went inside to pay his tab, but the bouncer would not

6    let Ricard in.  (The bar employee testified he kept Ricard out because he had a

7    bloody nose.)  Ricard kept trying to look inside the bar through a window.

8    [Petitioner] and Zygo ran out through the back door.

9         2.  *Matthew Diggs's Involvement*

10        Matthew Diggs, a member of SDV, was a friend of [Petitioner]'s and an

11   acquaintance of Zygo[].  Diggs did not know anyone in SDV with the moniker

12   "Kid."

13        Diggs testified he knew Ricard through [Petitioner] and Zygo.  Ricard had

14   broken into Diggs's car and stolen a purse and smart phone that belonged to

15   Diggs's ex-girlfriend.  Diggs believed Ricard had been told by "Rick G." that

16   Diggs had marijuana in his car.  Diggs told Zygo about the break-in.

17        In July 2015 Zygo gave Diggs a $100 bill while they were at the bar.

18   Diggs could not recall Zygo saying why he gave him the money.  Because his

19   birthday was a short time away, Diggs considered the money a birthday gift.

20        3.  *The Investigation*

21        Los Angeles County Deputy Sheriff Daniel Ament was assigned to

22   investigate the incident.  He testified he inspected the scene of the attack two days

23   after it had occurred and saw no large rocks or rocks with blood on them.

24   However, there were large chunks of asphalt and concrete nearby.

25        Deputy Ament interviewed Ricard on July 20, 2015.  Ricard told Ament

26   that [Petitioner] had said, "This is for what you and Rick G. did" before hitting

27   him, not "This is for SDV Kid."  Although Ricard said the attack occurred by a

28

1  beauty college at the edge of the parking lot, on a photograph he identified a

2  building housing a restaurant as the location.

3        Deputy Ament interviewed Holcombe on July 31, 2015.  Holcombe gave

4  conflicting versions of the evening's events.  Holcombe explained, when he and

5  Ricard arrived at the bar, Ricard introduced him to two men.  Ricard left the bar

6  with the men.  Holcombe sat in his car for a few minutes and then went to find

7  Ricard.  Holcombe first said Ricard was getting up from the ground when he saw

8  him, and his wallet, keys and cell phone were on the ground by his feet.  He then

9  said that he never saw Ricard's possessions on the ground.  Holcombe told Ament

10  Ricard looked like he had been in a fight; he had blood on his face and was dazed.

11  Holcombe also told Ament that he did not want to be involved.

12        Deputy Ament spoke to Holcombe again on January 11, 2016.  Holcombe

13  denied knowing [Petitioner] and said Ricard had left his wallet, cell phone and

14  keys in Holcombe's car before they went into the bar.  Holcombe expressed fear

15  for his safety if he testified.

16        Deputy Ament also reviewed surveillance video from the bar.  The

17  recording showed Ricard and Holcombe entering the bar together.  Ricard shook

18  hands with [Petitioner] and Zygo.  At 12:16 a.m. Ricard, Holcombe and Zygo

19  were standing by the bar.  About 12:53 a.m. [Petitioner] and Zygo left the bar and

20  entered the parking lot.  They walked back toward the bar about a minute later,

21  and [Petitioner] gestured at the window.  Ricard and Holcombe then left the bar,

22  and the four men walked to the parking lot and out of camera view.  [Petitioner]

23  and Zygo returned from the parking lot and walked back into the bar at 12:57 a.m.

24        The video recording showed Ricard walk back to the bar at about 1:00

25  a.m. and speak to the bouncer.  A man identified as Nick, who had been in front

26  of the bar, went inside and around to the patio where [Petitioner] and Zygo had

27  moved.  [Petitioner] and Zygo then walked to the back door and ran outside.

28

4. *Zygo's Jailhouse Calls*

Following his arrest and while waiting for trial, Zygo made several telephone calls from jail that were recorded and played for the jury.  On August 3, 2015, speaking to an unidentified man about Holcombe, Zygo said, "Somebody needs to get at him and let him know what's going to happen if that shit goes south."  Zygo was concerned "that fool is going to roll."

On August 17, 2015 Zygo asked an unidentified woman to get Diggs's phone number so Zygo could have his "lawyer contact him and talk about whatever Rick G[.] and [Ricard] broke into his car and robbed him back in the day."  Zygo admonished her to "[t]ell him to don't say anything about recent things like . . . my birthday gift to him, anything like that he doesn't have to say anything about that, just keep his mouth shut about all that.  He'll know what you are talking about."

In another conversation with an unidentified woman on October 2, 2015, Zygo expressed anger at Diggs.  Zygo told the woman he could have Diggs incarcerated with him "[f]or the same . . . thing."  The woman protested that Zygo would not do that.  Zygo told her to tell Diggs what he told her, and that it would behoove Diggs to keep quiet.

5. *The Defense*

Zygo testified he and [Petitioner] had been friends since childhood.  He had known Ricard since they were younger, had gone to high school with Diggs and was an acquaintance of Holcombe's.  Ricard was not a member of SDV, but had spent time with members of the group before he underwent a change in character and started stealing from his friends.

The defense theory of the case was that the large sum of cash Ricard claimed he was carrying the night of the incident was his mother's rent money.  Ricard kept the money and fabricated the robbery to explain why it was missing.

1        According to Zygo, he, [Petitioner] and [Petitioner]'s girlfriend went to

2   the bar about 10:30 p.m. on July 18, 2015.  They saw Ricard and Holcombe when

3   they walked into the bar.  Ricard asked Zygo and [Petitioner] if they wanted to go

4   outside and smoke marijuana.  Zygo said yes; they would meet him outside after

5   they finished their drinks and Zygo got marijuana from his car.  Zygo,

6   [Petitioner], Ricard and Holcombe left the bar and walked toward a restaurant,

7   where Ricard sat down and rolled a cigarette.

8        Ricard mentioned he was planning on moving back to Lancaster.  Zygo

9   told him he had done a lot of wrong to people there and needed to make amends if

10  he was moving back.  Ricard had broken into people's houses and cars and stolen

11  from them; Diggs was one of those people.

12       Ricard, responded, "[W]ell, you can feel however you want to feel . . . but

13  fuck you fools, I'm pretty strapped."  Believing Ricard was getting ready to come

14  toward him and appeared to be reaching toward his waistband, Zygo reacted

15  "because the term 'I'm strapped' usually means you have a weapon of some sort."

16  Zygo punched Ricard in the mouth.  Ricard fell back, then got up and swung at

17  Zygo.  Zygo hit him again, and Ricard tripped and fell.

18       [Petitioner] grabbed Zygo's arm and said they needed to leave.  Zygo and

19  [Petitioner] walked back to the bar.  Holcombe, who had just watched the scuffle,

20  remained with Ricard.  Inside, Zygo and [Petitioner] finished their drinks and

21  went to use the restroom.  When they came out, Zygo saw Ricard approaching the

22  bar, looking angry.  Ricard was refused entry to the bar and began looking in the

23  windows.  Zygo and [Petitioner] left through the back door to avoid a

24  confrontation.  Zygo denied having a gun with him that night.

25       Responding to the recorded jailhouse calls, Zygo explained he wanted to

26  contact Holcombe to find out what he was going to say, not to influence his

27  testimony.  Zygo was afraid Holcombe might lie because of his friendship with

28  Ricard.  Zygo did not want Diggs to mention anything about the $100 birthday

gift about a week after the incident because he knew his gesture would be misconstrued.  Zygo also said he was upset with Diggs for not wanting to testify and tell the truth and wanted Diggs to contact his attorney.

[Petitioner] did not testify in his defense.

(Lodgment 1 at 2-8.)

## IV.

## PETITIONER'S CLAIMS

Petitioner raises the following claims for habeas corpus relief:

(1) The prosecutor presented insufficient evidence to support Petitioner's robbery conviction; and

(2) The California Court of Appeal's determination that it was not bound by the jury's determination on the gun use allegation deprived Petitioner of his Sixth and Fourteenth Amendment rights to have a jury determine the facts necessary for conviction.

## V.

## STANDARD OF REVIEW

A.     **28 U.S.C. § 2254**

The standard of review that applies to Petitioner's claims is stated in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable

9

1    determination of the facts in light of the evidence presented in the State court

2    proceeding.

3    28 U.S.C. § 2254(d).  If these standards are difficult to meet, it is because they were meant to be.

4    As the United States Supreme Court stated in Harrington v. Richter,[5] while the AEDPA "stops

5    short of imposing a complete bar on federal court relitigation of claims already rejected in state

6    proceedings[,]" habeas relief may be granted only "where there is no possibility fairminded

7    jurists could disagree that the state court's decision conflicts" with United States Supreme Court

8    precedent.  Further, a state court factual determination must be presumed correct unless rebutted

9    by clear and convincing evidence.[6]

10   **B.      Sources of "Clearly Established Federal Law"**

11          According to Williams v. Taylor,[7] the law that controls federal habeas review of state

12   court decisions under the AEDPA consists of holdings (as opposed to dicta) of Supreme Court

13   decisions "as of the time of the relevant state-court decision."  To determine what, if any,

14   "clearly established" United States Supreme Court law exists, a federal habeas court also may

15   examine decisions other than those of the United States Supreme Court.[8]  Ninth Circuit cases

16   "may be persuasive."[9]  A state court's decision cannot be contrary to, or an unreasonable

17   application of, clearly established federal law, if no Supreme Court decision has provided a clear

18   holding relating to the legal issue the habeas petitioner raised in state court.[10]

19

20

21

22   [5] 562 U.S. 86, 102, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

22   [6] 28 U.S.C. § 2254(e)(1).

23   [7] 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

24   [8] Deck v. Jenkins, 814 F.3d 954, 978 n.3 (9th Cir. 2016) (citing Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999)); LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th Cir. 2000).

25   [9] Duhaime, 200 F.3d at 600.

26   [10] Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law."); see also Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

1    Although a particular state court decision may be both "contrary to" and an

2    "unreasonable application of" controlling Supreme Court law, the two phrases have distinct

3    meanings under Williams.

4    A state court decision is "contrary to" clearly established federal law if the decision either

5    applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs

6    from the result the Supreme Court reached on "materially indistinguishable" facts.[11]  If a state

7    court decision denying a claim is "contrary to" controlling Supreme Court precedent, the

8    reviewing federal habeas court is "unconstrained by § 2254(d)(1)."[12]  However, the state court

9    need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the

10   reasoning nor the result of the state-court decision contradicts them."[13]

11   State court decisions that are not "contrary to" Supreme Court law may be set aside on

12   federal habeas review only "if they are not merely erroneous, but 'an unreasonable application'

13   of clearly established federal law, or based on 'an unreasonable determination of the facts.'"[14]

14   Accordingly, this Court may reject a state court decision that correctly identified the applicable

15   federal rule but unreasonably applied the rule to the facts of a particular case.[15]  However, to

16   obtain federal habeas relief for such an "unreasonable application," a petitioner must show that

17   the state court's application of Supreme Court law was "objectively unreasonable."[16]  An

18   "unreasonable application" is different from merely an incorrect one.[17]

19

20

---

[11] Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam) (citing Williams, 529 U.S. at 405-06); Anderson v. Gipson, 902 F.3d 1126, 1132 (9th Cir. 2018).

[12] Williams, 529 U.S. at 406.

[13] Early, 537 U.S. at 8.

[14] Id. at 11 (citing 28 U.S.C. § 2254(d)).

[15] See Williams, 529 U.S. at 406-10, 413.

[16] Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) ("Under § 2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable.") (internal quotation marks and citations omitted); Woodford v. Visciotti, 537 U.S. 19, 27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).

[17] Williams, 529 U.S. at 409-10.

Petitioner raised his claims with both the California Court of Appeal and California Supreme Court on direct review, and the California Supreme Court denied review without comment. (Lodgments 1-3, 7-9.) The California Supreme Court's "silent" denial of those claims is considered to be "on the merits" and to rest on the California Court of Appeal's last reasoned decision.[18] This Court therefore has reviewed the Court of Appeal's decision discussing those claims under the AEDPA standards set forth above.

## VI.

## DISCUSSION[19]

In Claim One, Petitioner argues the prosecutor presented insufficient evidence to support Petitioner's robbery conviction as an aider and abettor where the conviction necessarily relied on a finding that Petitioner held a firearm during the commission of the crime, but the jury found not true an allegation that Petitioner had personally used a firearm during the commission of the robbery. (Petition at 4-5, 20-29; Traverse at 10, 40-48.) In Claim Two, Petitioner argues the California Court of Appeal's sufficiency of the evidence review deprived Petitioner of his Sixth and Fourteenth Amendment rights to have a jury determine the facts necessary for conviction when it concluded its sufficiency review was not limited by the jury's not true finding on the related gun use allegation. (Petition at 6-7, 29-36; Traverse at 10-11, 48-53.)

Petitioner's claims are premised on the following charges and jury findings: Petitioner was charged by information with second degree robbery, and the prosecution specially alleged that he had personally used a firearm in committing that crime. (1 CT at 167-68.) As noted above, the jury convicted [Petitioner] of robbery but found not true the allegation that Petitioner used a firearm in committing the robbery. (2 CT at 223, 227-28.)

For the reasons discussed below, Petitioner is not entitled to federal habeas relief on either of his claims.

---

[18] See Ylst v. Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); see also Wilson v. Sellers, 584 U.S. ___, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018) (federal courts should "look through" unexplained decision to the last reasoned state-court decision providing a relevant rationale).

[19] This Court has read, considered, and rejected on the merits all of Petitioner's contentions. This Court discusses Petitioner's principal contentions herein.

**A.      Sufficiency of the Evidence**

Petitioner alleges that the record is devoid of any evidence that Petitioner took Ricard's money or participated in taking Ricard's money, there was insufficient evidence that Petitioner had knowledge of and acted in concert with Zygo to rob Ricard, and Petitioner's mere presence and failure to prevent the robbery was not enough to aid and abet the robbery.  (Petition at 4-5, 20-29; Traverse at 10, 40-48.)   Petitioner further alleges that the jury's finding that he did not use a firearm means that the jury rejected any theory that petitioner acted as an enforcer to Zygo's robbery by standing nearby holding a firearm.  (Traverse at 10, 41-50.)

**1.   State Court Decision**

On review, the California Court of Appeal agreed with Petitioner that his mere presence at the scene, and knowledge of but failure to prevent the robbery, did not equate to aiding and abetting the offense.  (Lodgment 1 at 15.)  The Court of Appeal nonetheless found sufficient evidence to support Petitioner's robbery conviction, reasoning:

> Viewed in the light most favorable to the judgment, the evidence established that Ricard joined [Petitioner] and Zygo to smoke marijuana outside the bar.  After telling Ricard he was going to pay for something he had done in the past, [Petitioner] hit Ricard; Zygo then joined in the attack.  The assault ended, and Zygo pulled a gun from his waistband.  [Zygo] handed the gun to [Petitioner], who held it – pointing downwards – while Zygo went through Ricard's pockets removing items, including cash.[Footnote]  Taking the cash, [Petitioner] and Zygo both ran back to the bar. When Ricard returned to the bar looking for them, the two men fled out the back.

> From this evidence the jury could have reasonably concluded [Petitioner] played an affirmative, supportive role in the robbery and was not simply an innocent or passive bystander.  Together, his companionship with Zygo, his instigation of the joint assault on Ricard, his possession of the firearm while the robbery took place, and his flight with Zygo from the scene of the crime constitute substantial evidence [Petitioner] aided and abetted the robbery.

13

1  (Lodgment 1 at 15-17.)  The Court of Appeal explained that the jury's not true finding on the

2  firearm enhancement allegations did not preclude consideration of Ricard's testimony that

3  Petitioner held the gun during the robbery.  (Lodgment 1 at 16 n.4.)[20]

4        **2.  Legal Standard**

5        The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant

6  may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to

7  constitute the crime with which he is charged."[21]  In <u>Jackson v. Virginia</u>,[22] the United States

8  Supreme Court announced the federal standard for determining the sufficiency of the evidence to

9  support a conviction.  Under <u>Jackson</u>, "[a] petitioner for a federal writ of habeas corpus faces a

10  heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

11  on federal due process grounds."[23]  The Supreme Court has held that "the relevant question is

12  whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

13  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[24]

14  "Put another way, the dispositive question under <u>Jackson</u> is 'whether the record evidence could

15  reasonably support a finding of guilt beyond a reasonable doubt.'"[25]

16        When the factual record supports conflicting inferences, the federal court must presume,

17  even if it does not affirmatively appear on the record, that the trier of fact resolved any such

18

19

20  [20] Citing <u>People v. Lewis</u>, 25 Cal. 4th 610, 656 (2001) ("[s]ufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. . . . This review should be independent of the jury's determination that evidence on another count was insufficient.") (citing <u>United States v. Powell</u>, 469 U.S. 57, 68, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984)); <u>People v. Santamaria</u>, 8 Cal.4th 903, 911 (1994) ("if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both. . . . When a jury renders inconsistent verdicts, 'it is unclear whose ox has been gored.' . . . The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity.' . . . Because the defendant is given the benefit of the acquittal, 'it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted.'") (also citing <u>Powell</u>).

21

22

23

24

25  [21] <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

26  [22] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

27  [23] <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).

28  [24] <u>Jackson</u>, 443 U.S. at 319.

[25] <u>Chein v. Shumsky</u>, 373 F.3d 978, 982-83 (9th Cir. 2004) (en banc) (quoting <u>Jackson</u>, 443 U.S. at 318).

14

conflicts in favor of the prosecution, and the federal court must defer to that resolution.[26]

Additionally, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to

sustain a conviction."[27]

In applying these principles, the federal habeas court looks to state law for the substantive

elements of the criminal offense, but the minimum amount of evidence that the Constitution

requires to prove the offense "is purely a matter of federal law."[28]  The Court must conduct an

independent review of the record when a habeas petitioner challenges the sufficiency of the

evidence.[29]

The Supreme Court has "made it clear that Jackson claims face a high bar in federal

habeas proceedings because they are subject to two layers of judicial deference."[30]  In assessing

a sufficiency of evidence challenge governed by the AEDPA standard of review, a federal

habeas court must apply a "double dose of deference that can rarely be surmounted."[31]

### 3.  Analysis

Viewing the evidence in the light most favorable to the verdict, the evidence amply

supported Petitioner's robbery conviction.  The Superior Court instructed the jury on robbery,

personal use of a firearm, and aiding and abetting principles.  (5 RT at 2207-09, 2211-12, 2408-

11, 2423; 2 CT at 241-42, 246-47, 251-52.)   Under California law, robbery requires taking the

property of another by force or fear.[32]  To convict Petitioner of robbery as a direct perpetrator,

the jury had to find that Petitioner took Ricard's personal property in Ricard's possession against

Ricard's will, by force or fear, with the intent to permanently deprive Ricard of his property.  (5

---

[26] Jackson, 443 U.S. at 326.

[27] Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

[28] Coleman v. Johnson, 566 U.S. 650, 655, 132 S. Ct. 2060, 182 L. Ed. 2d 978 (2012); see also Maquiz v. Hedgpeth, 907 F.3d 1212, 1218 (9th Cir. 2018).

[29] Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

[30] Coleman v. Johnson, 566 U.S. at 651; see also Parker v. Matthews, 567 U.S. 37, 43, 132 S. Ct. 2148, 183 L. Ed. 2d 32 (2012) (combination of AEDPA standard of review and Jackson standard imposes a "twice-deferential standard"); Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018) ("In addition to Jackson's already deferential standard, a second level of deference applies under AEDPA.")

[31] Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), cert. denied, 566 U.S. 1039 (2012).

[32] Cal. Penal Code § 211.

RT at 2408-10; 2 CT at 246-47.)  To convict Petitioner of robbery as an aider and abettor, the jury had to find that Petitioner: (1) acted with knowledge of Zygo's unlawful purpose, and with the intent or purpose of facilitating the robbery; and (2) by his action aided, promoted, encouraged, or instigated the robbery.  (5 RT at 2207-09; 2 CT at 241-42.)  The jury was instructed – consistent with Petitioner's argument and California law – that "[m]ere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting," and "[m]ere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (5 RT at 2208; 2 CT at 241-42.)

As the trial court observed at the close of evidence, the case against Petitioner turned on whether the jury believed Ricard's or Zygo's account of what happened – all the evidence tying Petitioner to the robbery came from Ricard's testimony.  (5 RT at 2185.)  Ricard admitted he had lied to police in his own criminal cases and lied about the marijuana in this case.  (3 RT at 1222, 1224, 1326, 1332, 1343-44; 4 RT at 1529, 1542-51, 1553, 1605-07, 1633-35.)  Conversely, Zygo testified that he hit Ricard in self-defense, that Petitioner was present but did not get involved, and that neither he nor Petitioner went through Ricard's pockets or took anything from Ricard.  (5 RT at 2112-15, 2121-22, 2155-63.)[33]  By their verdict, the jury found Ricard credible. It is not for this Court on habeas review to question the jury's credibility finding.[34]

Ricard testified that he offered to smoke marijuana with Petitioner and Zygo when he saw them at the bar, Petitioner and Zygo later told him they were ready to smoke, and all three men went outside the bar.  (3 RT 1249-51, 1255, 1300-01; see also 5 RT at 2108 (Zygo similarly testifying).)  Ricard walked to a dark area of the parking lot and  sat down to roll a joint.  (3 RT at 1257; see also 5 RT at 2110 (Zygo similarly testifying).)  Ricard testified that when he

---

[33] Zygo testified that at one point Petitioner grabbed him by the arm and said they had to get out of there and go back to the safety of their car in case Ricard had a weapon.  (5 RT at 2115.)  However, instead of retreating to safety Zygo returned to the bar because his adrenalin was "really up" to take a drink.  (5 RT at 2117.)  Zygo said he and Petitioner later left the bar because he saw Ricard returning looking angry, did not know whether Ricard had a firearm, and wanted to avoid further conflict.  (5 RT at 2119-21.)

[34] See Bruce v. Terhune, 376 F.3d 950, 957-58 (9th Cir.2004) (federal habeas court could not revisit jury's resolution of inconsistencies between victim's account and those of the defendant – victim's account was not "wholly incredible"; "The jury resolved this paradigmatic credibility contest by determining that [the victim] was more believable.  Except in the most exceptional of circumstances, Jackson does not permit us to revisit such credibility determinations.").

finished rolling the joint, Petitioner then said to him, "You're gonna pay for what you did to SDV Kid," referring to a person Ricard knew as "Kid." (3 RT at 1258, 1302, 1325, 1334; 4 RT at 1596.) Petitioner said, "You are about to pay for that," with Zygo standing next to him less than two feet away from Petitioner. (3 RT at 1259). Petitioner punched Ricard in the face knocking Ricard's glasses off. (3 RT at 1260-61, 1303; 4 RT at 1577.) Zygo put Ricard in a choke hold and Petitioner punched and kicked Ricard. (3 RT at 1261-62, 1265, 1304; 4 RT at 1575-77.) Zygo eventually began hitting Ricard with a rock. (3 RT at 1263-65, 1304-05; 4 RT at 1578-79, 1581-82.)

Ricard testified that following the assault both Zygo and Petitioner "went through my socks and my pockets and took my wallet and all my possessions." (3 RT at 1265.) Regarding the gun, Ricard said that Zygo took the gun from his waistband, cocked the gun, and passed the gun to Petitioner when the men were going through his pockets. (3 RT at 1266-69; 4 RT at 1580, 1589.) Ricard said that Zygo and Petitioner kept the gun pointed at the ground. (3 RT at 1267; 4 RT at 1621.) Ricard later explained that Petitioner stood there with the gun while Zygo went through Ricard's pockets and socks and took Ricard's cash. (3 RT at 1270-73, 1287-88.) Zygo and Petitioner then ran back toward the bar, leaving Ricard on the ground. (3 RT at 1274.) Zygo and Petitioner later were seen on surveillance footage running from the bar. (4 RT at 1841.)

From this evidence a rational jury could conclude that in this case Petitioner did more than just simply stand by and fail to intervene while Zygo robbed Ricard. Petitioner twice threatened Ricard that he would "pay" for what he had done to Kid. According to Ricard, Petitioner and Zygo then assaulted Ricard, went through his pockets and socks, took his wallet and possessions, and ran away. While Ricard later explained that Zygo cocked and handed Petitioner a gun which Petitioner held (pointing down) before Zygo went through Ricard's socks and pockets and took Petitioner's cash, the evidence supported a reasonable inference that Petitioner acted with knowledge and intent to rob Ricard – either directly by taking Ricard's possessions by force or fear after threatening to make Ricard "pay," or by aiding Zygo in the robbery by assaulting Ricard and remaining present (either with or without a gun) until Zygo

1  could get Ricard's possessions, and later running away with Zygo.  Regarding intent, a

2  defendant's knowledge and purpose to aid and abet a robbery can be inferred from circumstantial

3  evidence and need not be based on direct evidence. [35]   The direct and circumstantial evidence of

4  intent from Ricard's explanation of what happened was sufficient to support Petitioner's robbery

5  conviction.[36]

6  **B.    State Courts' Consideration of Petitioner's Alleged Gun Possession**

7        Petitioner contends that the state courts should not have considered evidence of his

8  alleged possession of a gun in considering whether the evidence supported his robbery

9  conviction given the jury's not true finding on the related firearm use allegation.  Petitioner

10  argues that the Court of Appeal's consideration improperly intruded on the province of the jury.

11  (Petition at 6-7, 29-36; Traverse at 10-11, 48-53.)  Petitioner has shown no constitutional

12  violation.

13        **1.  State Court Decision**

14        As detailed above, in finding sufficient the evidence of robbery the California

15  Court of Appeal considered, among other evidence, Ricard's testimony that Petitioner

16  held the gun pointed down while Zygo took Ricard's cash.  (Lodgment 1 at 15-17.)

17        **2.  Legal Standard**

18        The Sixth and Fourteenth Amendments "indisputably entitle a criminal defendant to a

19  jury determination that [he] is guilty of every element of the crime with which he is charged,

20

21  _____

22  [35] See People v. Hill, 17 Cal. 4th 800, 851-52 (1998).

   [36] This case is unlike the cases Petitioner cites, where the evidence of intent largely was based on "unsupported
23  speculation."  See, e.g., Juan H. v. Allen, 408 F.3d 1262, 1277-78 (9th Cir. 2005) (finding insufficient evidence of
   intent for first degree murder where minor defendant did no more than accompany and stand behind shooter then ran
24  away after the shots; minor said nothing at the time and record did not show that he acted in a way to encourage or
   facilitate the killings; as amended, cert. denied, 546 U.S. 1137 (2006); People v. Lara, 9 Cal. App. 5th 296, 322-26
25  (2017) (finding insufficient evidence of aiding and abetting or directly perpetrating assault with a firearm resulting
   in murder where codefendants merely were companions present at the scene of a crime, one said "calm down"
26  during the argument that preceded the assault and murder, and fled after the crime and made deliberately false
   statements to police); compare People v. Gonzales, 52 Cal. 4th 254, 295-96 (2011) (finding sufficient evidence of
27  intent to aid and abet murder or assault with a deadly weapon naturally and probably causing the murder where both
   defendants urged driver to turn car around to confront victims, exited the car together, had just committed an armed
28  robbery, and where the codefendant was armed and knew the perpetrator was armed), cert. denied, 566 U.S. 908
   (2012).

beyond a reasonable doubt."[37]  Where a jury makes special findings, those findings must be given deference.[38]  However, the United States Supreme Court long has held that a defendant cannot attack a conviction based on an assertedly inconsistent verdict of acquittal on another count, unless the acquittal logically excludes a finding of guilt.[39]  "[I]nconsistent verdicts may

---

[37] Apprendi v. New Jersey, 530 U.S. 466, 476-77 & n.3, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (citation and internal quotations omitted); see also Cavazos v. Smith, 565 U.S. 1, 2, 132 S. Ct. 2, 181 L. Ed. 2d 311 (2011) (Jackson "makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial").

[38] Mitchell v. Prunty, 107 F.3d 1337, 1339 n.2 (9th Cir. 1997) ("Special findings, by contrast, are dispositive of the questions put to the jury.  Having agreed to the questions, the government cannot now ask us to ignore the answers; to do so would be a clear violation of petitioner's Sixth Amendment rights."), cert. denied, 522 U.S. 913 (1997), overruled by Santamaria v. Horsley, 133 F.3d 1242 (9th Cir.) (en banc), amended, 138 F.3d 1280 (9th Cir.), cert. denied, 525 U.S. 824 (1998); United States v. Pimentel-Lopez, 859 F.3d 1134, 1140-41 (9th Cir. 2016) (district court could not substitute its own calculation of quantity of drugs for jury's specific factual finding where the jury had been asked to decide the quantity of drugs; ignoring jury's specific factual findings is a "clear violation of petitioner's Sixth Amendment rights").

Mitchell concerned the sufficiency of the evidence to support a second degree murder conviction, where the jury found not true a weapon enhancement and found that Mitchell did not drive the car that ran over the victim.  Mitchell, 107 F.3d at 1340.  Based on these findings, the Ninth Circuit reviewed the sufficiency of the evidence only under an aiding and abetting theory.  Id.  In overruling Mitchell, the Santamaria Court found that Mitchell was based on the "flawed premise" under California law that if a jury returned a not true finding on a weapon enhancement question but also returned a murder conviction, it must have concluded that the defendant aided and abetted the murder.  Santamaria, 133 F.3d at 1248.  However, California law provides that murder can be proven without unanimous agreement as to the particular theory (i.e., either as a direct perpetrator or as an aider and abettor), such that a defendant can be convicted "so long as the jury is convinced beyond a reasonable doubt that he was culpably involved in the killing."  Id. at 1246-48 (citing People v. Santamaria, 8 Cal. 4th 903, 918-19 (1994)).

The State's burden under the "either/or" theory is to prove beyond a reasonable doubt that Santamaria used the knife or aided and abetted, but it can meet this burden even if it fails to prove beyond a reasonable doubt that he used the knife and it fails to prove beyond a reasonable doubt that he aided and abetted, so long as the jury is convinced beyond a reasonable doubt that he was culpably involved in the killing. . . . ¶ Requiring the State to prove either direct perpetration or aiding and abetting beyond a reasonable doubt could result in acquittal in a situation where the jury is convinced beyond a reasonable doubt that two codefendants committed a crime, but is not sure beyond a reasonable doubt as to which defendant was the direct perpetrator and which was the aider and abettor.

Id. at 1248.

[39] United States v. Powell, 469 U.S. at 68-69 (reaffirming rule announced in Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 356 (1932), prohibiting a criminal defendant from attacking a conviction because it is inconsistent with an acquittal on a separate count; noting, "the best course to take is simply to insulate jury verdicts from review on [the] ground [that verdicts are inconsistent].")  The Powell Court noted that nothing in the opinion was "intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other."  Id. at 69, n.8.  In this case, the jury's not true finding on the gun use allegation does not logically exclude a finding of guilt on the robbery charge for the reasons explained herein.

1   not be used to demonstrate the insufficiency of the evidence for the count on which the defendant

2   was convicted."[40]

3       **3.   Analysis**

4       The California Court of Appeal's consideration of Ricard's testimony that Petitioner held

5   a gun while the robbery occurred arguably was consistent with the evidence and the related jury

6   finding, since Ricard testified that Petitioner simply held the gun that was handed to him and

7   pointed the gun at the ground during the robbery.  (3 RT at 1267; 4 RT at 1621.)  To find

8   Petitioner personally used a firearm in committing the robbery, and thereby enhance his

9   sentence, the trial Court instructed the jury that it had to find that Petitioner "intentionally

10  displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a

11  human being with it."  (5 RT at 2423; 2 CT at 252.)[41]   A rational jury could have concluded

12  from Ricard's testimony that Petitioner did not intentionally display the gun in a menacing

13  manner, fire it, or strike Ricard with it.[42]

14      Significantly, the jury's not true finding on the gun use allegation would not preclude a

15  finding that Petitioner robbed Ricard (either by directly taking Ricard's belongings, or while

16  displaying a gun in a non-menacing manner, or without a gun at all after assaulting Ricard).  The

17  use of a gun is not an element to robbery under California law, and the jury was not required to

18  decide unanimously whether Petitioner was guilty as an aider and abettor or as a direct

19  perpetrator of the robbery.[43]  Nothing about the Court of Appeal's decision finding substantial

20
21  [40] United States v. Ares-Garcia, 420 Fed. App'x 707, 707 (9th Cir.) (citing Powell), cert. denied, 565 U.S. 924
    (2011); see also Ford v. Peery, 999 F.3d 1214, 1226 (9th Cir. 2021) ("The apparent inconsistency between the jury's
22  guilty verdict on the murder charge and its inability to decide on the firearm enhancements is not a reason to set
    aside its guilty verdict."), reh'g denied, 9 F.4th 1086 (9th Cir.), cert. denied, 143 S. Ct. 169 (2022).

23  [41] Cal. Penal Code § 12022.5(a) (providing for sentence enhancement).

24  [42] Compare Alvarado v. Superior Court, 146 Cal. App. 4th 993, 1004 (2007) (suggesting sufficient evidence for a
    gun use allegation where a defendant "deliberately shows a gun" or "otherwise makes its presence known" and there
25  is no evidence to suggest any purpose other than intimidating the victim to facilitate a crime; "[A] 'use' finding does
    not necessarily require a defendant to point the gun at his victims.").

26  [43] See Cal. Penal Code § 211; People v. Russo, 25 Cal. 4th 1124, 1134-35 (2001) (jury must agree on a particular
    crime but need not unanimously agree "as to exactly how the crime was committed" where multiple theories or acts
27  may form the basis of a guilty verdict); People v. Davis, 8 Cal. App. 4th 28, 45 (1992) (finding in robbery case that
    jurors need not unanimously agree on "whether the defendant is an aider or abettor or a principal even when
28  different evidence and facts support each conclusion"); accord People v. Smith, 60 Cal. 4th 603, 618 (2014) ("the
    jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct
    perpetrator").

                                    20

evidence to support Petitioner's robbery conviction from the facts of Petitioner's case, viewed in the light most favorable to the verdict, improperly invaded the province of the jury.[44]

For these reasons, the state courts' rejection of Petitioner's claims does not merit federal habeas relief.

## VII.

## **RECOMMENDATION**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order:  (1) approving and accepting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED:  10/19/2023

HONORABLE LOUISE A. LA MOTHE
United States Magistrate Judge

---

[44] Powell, 469 U.S. at 68-69.